UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MIDWEST PAIN INSTITUTE CENTER FOR MINIMALLY INVASIVE SPINE, P.C.,<br>    Plaintiff, | )<br>)<br>)<br>) | |
| vs. | ) | No. 1:15-cv-01891-SEB-TAB |
| KENT B. REMLEY, M.D.,<br>    Defendant.<br>_____ | )<br>)<br>)<br>)<br>) | |
| KENT B. REMLEY,<br>    Counter Claimant, | )<br>)<br>) | |
| vs. | )<br>) | |
| MIDWEST PAIN INSTITUTE CENTER FOR MINIMALLY INVASIVE SPINE, P.C.,<br>    Counter Defendant. | )<br>)<br>) | |

**ORDER ON DEFENDANT/COUNTER CLAIMANT'S
MOTION FOR SUMMARY JUDGMENT**

The matter is before us on Defendant/Counter Claimant Kent B. Remley, M.D.'s Motion for Summary Judgment. [Dkt. No. 38.] Plaintiff/Counter Defendant has responded in opposition. For the following reasons we GRANT IN PART and DENY IN PART Defendant's Motion.

This case involves an employment dispute between Dr. Remley and Midwest Pain Institute Center for Minimally Invasive Spine, P.C. ("Midwest" or "MPI"). Although several provisions of the Employment Agreement are at issue, the crux of this case is

whether Dr. Remley was responsible for a share of Midwest's operating expenses or whether those expenses were to be borne exclusively by Midwest.

## Facts

**The Parties' Relationship**

The parties entered into an Employment Agreement effective July 1, 2014 ("Employment Agreement" or "Agreement").[1]  Their dispute has arisen over the parties' duties and obligations with respect to three aspects of the Employment Agreement, to wit, Midwest's obligation to provide Dr. Remley with "attendants, facilities and services suitable to his specialty/ies and adequate for Employee's provision of services pursuant to this Agreement" [§ 3.2(a)], Midwest's obligation to provide monthly calculations of Dr. Remley's "Net Collections" [§ 4.4], and Dr. Remley's financial obligations to Midwest.

Midwest was founded in 2001 by Dr. Steven Levine. [Declaration of Dr. Steven Levine ("Levine Decl.") ¶ 1.] Dr. Levine created Midwest to offer minimally invasive procedures and treatment for the relief of acute and chronic back and spinal pain. [*Id.* ¶ 2.] Prior to joining Midwest, Dr. Remley practiced interventional pain management and minimally invasive spine surgery at Community Westview Hospital in Indianapolis. [Affidavit of Kent B. Remley ("Remley Aff.") ¶ 2.] From late 2013 to mid-2014, Dr. Remley, Dr. Levine, and Midwest's practice administrator at the time, Andy Griffiths, had on-going conversations about Midwest, the types of services it offered, and the nature of

---

[1] Dr. Remley contends that the Employment Agreement was meant to be effective as of August 1, 2014, but that the document was not revised to reflect the agreement between the parties. Midwest acknowledges Dr. Remley's statement, but does not take a position as to its accuracy. [*See* Dkt. No. 44 at 4.]

its financial arrangements with physicians who worked there. [Levine Decl. ¶ 5.] Dr. Levine and Dr. Remley discussed Dr. Remley's practice and the types of procedures he performed. According to Dr. Levine, he explained to Dr. Remley the financial details of practicing at Midwest, cautioning him not to enter into any agreement with Midwest lightly, on the grounds that both Dr. Remley's livelihood and Midwest's profitability would require his active and diligent participation to cover his expenses. [*Id.* ¶ 6.] These discussions culminated in the execution of the Employment Agreement.

Dr. Remley announced his resignation from Midwest in May, effective July 1, 2015. Midwest contends that by the end of May 2015, Dr. Remley's overall deficit in payments for direct and overhead expenses exceeded his collections by $367,980.09. Dr. Remley, on the other hand, contends that he owes nothing to Midwest and, indeed, that Midwest owes him $129,056.62.

**The Employment Agreement**

**Attendants and Facilities**

The Employment Agreement requires Midwest to provide "attendants" and "facilities" sufficient for Dr. Remley to perform his services. Specifically, Section 3.2 of the Employment Agreement provides:

> Employer's Responsibilities. Employer shall during and with respect to the term of employment:
>
> a) Provide to Employee an office/work area, stenographic help, and such other attendants, facilities and services suitable to his specialty/ies and adequate for Employee's provision of services pursuant to this Agreement; . . .

According to Dr. Remley, despite Midwest's familiarity with his practice, "MPI failed to provide the necessary equipment and nursing assistance necessary for Remley to fully practice medicine in MPI's facilities consistent with the applicable standard of care." [Dkt. No. 39 at 2, ¶ 4.] Dr. Remley explains that his practice is focused on managing pain through "image guided injection procedures in the spine and joints to treat acute and chronic pain." [*Id.* at 4.] His in-office pain management techniques require the assistance of a nurse practitioner ("NP") or registered nurse ("RN"), which Midwest did not provide, "dramatically constrain[ing] . . . his ability to practice interventional pain management." [*Id.* at 4, 2.]

Midwest denies Dr. Remley's contentions. According to Midwest, it did not have an NP or RN on staff immediately before or during Dr. Remley's employment. [Declaration of Sharyl Border, Midwest Practice Administrator ("Border Decl.") at ¶ 11; Levine Decl. ¶ 8.] Because neither Dr. Levine nor Dr. Hall, the other doctor practicing at Midwest, required the assistance of an NP or RN, Ms. Border informed Dr. Remley that he would have to bear the full cost of employing a nurse. [Border Decl. ¶ 11.] Dr. Remley elected to perform his sedation procedures at a hospital or surgery center instead of having Midwest hire an NP or RN. [*Id.*]

Dr. Remley also alleges that his pain management treatment requires the use of fluoroscopic equipment to obtain useful images during the insertion of needles and therapeutic materials into various parts of the body. [Dkt. No. 39 at 4-5.] It is Dr. Remley's contention that the equipment Midwest made available to him was sub-optimal and supplies were either unavailable or expired. [*Id.* at 5.]

Midwest rejoins that it regularly ordered the supplies requested by Dr. Remley, which were charged to him as direct expenses and which Dr. Remley took with him when he left Midwest. [Border Decl. ¶ 12.] According to Ms. Border and Dr. Levine, Dr. Remley never expressed concern with the quality of Midwest's equipment, including the fluoroscopic equipment, which was maintained and immediately repaired when needed. [*Id.* ¶ 13; Levine Decl. ¶ 9.]

**Operating/Overhead Expenses**

The financial arrangement between the parties is set out in several sections of the Employment Agreement and its Exhibit A. As a starting point, Dr. Remley's salary is set forth in Exhibit A and § 4.2 of the Agreement requiring "[Midwest to] pay [Dr. Remley] during the term of employment the annualized salary specified on ***Exhibit A*** Section 4 (a)," subject to certain withholdings and deficits owed. [Agreement § 4.2.] Dr. Remley is entitled to (or liable for) Additional Payments as follows:

> 4.3 Additional Payments. With respect to each full or partial Calendar Quarter during which Employee is employed by Employer, if Net Employee Collections for that Calendar Quarter are positive, then any Accumulated Net Collections Deficit of Employee shall be deducted from such positive number (and retained by Employer), and if after such deduction a positive amount of Net Employee Collections remains, then such remainder shall be paid to Employee on or before the thirtieth (30th) day following the end of the applicable Calendar Quarter or as otherwise agreed by the parties (each an "Additional Payment"). Any Additional Payments payable under this Agreement shall be in addition to the Salary. Additional Payments shall be subject to withholdings and deductions.

Midwest is *owed* payments *from* Dr. Remley in "an amount equal to any then-current Accumulated Net Collections Deficit." [Agreement § 4.8.] The terms "Accumulated Net Collections Deficit of Employee" and "Net Employee Collections" are

used to determine whether Dr. Remley had a positive sum from his practice expenses and collections (which are paid to him as described above) or whether Dr. Remley was in the red and indebted to Midwest. Those terms are defined in the Agreement as follows:

> a) "Accumulated Net Collections Deficit" means at any given time the negative sum of (i) all negative Net Employee Collections amounts for all applicable prior Calendar Quarters (expressed as a negative number), plus all positive Net Employee Collections amounts for all applicable prior Calendar Quarters, plus all prior Accumulated Net Collections Deficit amounts repaid by Employee to Employer pursuant to Section 4.8, minus all Additional Payments paid or payable to Employee with respect to all applicable prior Calendar Quarters. For the avoidance of doubt, the parties acknowledge and agree that if at any given time the sum yielded by the foregoing equation is a positive number, there is no then-applicable Accumulated Net Collections Deficit.
>
> . . .
>
> e) "Net Employee Collections" means the positive or negative sum of (a) Employee Collections for the applicable period, minus (b) Direct Provider Physician Expenses attributable to Employee for the applicable period, minus (c) Employee's applicable portion of NP and PA Expenses for the applicable period.

[Agreement §§ 4.1(a) and (e).]

"Direct Provider Physician Expenses" and "NP and PA Expenses" are part of the Net Employee Collections Calculation and defined in the Agreement as follows:

> c) "Direct Provider Physician Expenses" means costs and expenses incurred during the applicable period and directly attributed by Employer to a Provider Physician, including for purposes of illustration only and not for purposes of specific inclusion or limitation, the portion paid or reimbursed by Employer of Provider Physician's salary and other compensation, employee benefits costs, insurance costs, vehicle expenses, travel expenses, phone and communications expenses,

6

continuing education expenses, and other costs and expenses directly attributable to a Provider Physician.[2]

. . .

g) "NP and PA Expenses" means costs and expenses incurred during the applicable period and directly attributed by Employer to a nurse practitioner or physician's assistant, including for purposes of illustration only and not for purposes of specific inclusion or limitation, the portion paid or reimbursed by Employer of such person's salary and other compensation, employee benefits costs, insurance costs, car expenses, phone and communications expenses, continuing education expenses, and other costs and expenses directly attributable to such person.[3]

[*Id.* §§ 4.1(c) and (g).] Finally, Exhibit A to the Employment Agreement provides the following agreement with respect to general allocation expenses.

5. Special Considerations for New Employee:

   a. General Allocation Expenses will be attributed to Employee through a graduated process as follows:

   i. Month one (1) Fifteen percent (15%) of general allocation expenses of Corporation plus direct Employee expenses attributable them.

   ii. Month two (2) Twenty percent (20%) of general allocation expenses of Corporation plus direct Employee expenses attributable them.

   iii. Month three (3) Twenty Five percent (25%) of general allocation expenses of Corporation plus direct Employee expenses attributable them.

---

[2] Midwest, in its sole discretion, classifies "expenses for tax or accounting purposes or for purposes of [the Employment Agreement] (for example, which expenses to include as Direct Provider Physician Expenses and which expenses to treat as Operating Expenses)" as well as allocating expenses and revenue between Provider Physicians. [Employment Agreement § 4.5.]

[3] The Agreement defines "NP and PA Revenues" as the revenues actually collected by Midwest which are directly attributable to NP and PA services rendered. [Agreement ¶ 4.1(h).]

7

> iv. Month four (4) Thirty Three percent (33.33%) of general allocation expenses of Corporation plus direct Employee expenses attributable them.
>
> v. Month five (5) Normal general allocation expenses of Corporation plus direct Employee expenses attributable them.
>
> vi. Once Employee pays off any debt from LOC draw for salary they can then be eligible for Stock Ownership and Addition Payments per Section 6 and 7 of Exhibit A.

**Financial Reporting Requirements**

The Employment Agreement requires Midwest to provide Dr. Remley with monthly calculations of his Employee Net Collections for each prior month and his Accumulated Net Collections Deficit as of the last day of each prior month. [Employment Agreement § 4.4.] Dr. Remley contends that Midwest failed to provide the financial information required by section 4.4 of the Employment Agreement.

Midwest does not dispute Dr. Remley's contention. It explains, however, that in the later part of 2014 Midwest hired Ms. Border as an accountant and new practice administrator to update and correct its financial statements which were, in Midwest's words, "in poor shape." In December 2014, Ms. Border provided copies of the requisite financial statements for July through November 2014. [Border Decl. ¶ 6.] At that time, according to Midwest's statements, Dr. Remley owed Midwest $193,437.59. [*Id.*]

**Standard of Review**

Summary judgment is appropriate when the record before the Court establishes that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the

evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the Court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *Id*. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," nor the existence of "some metaphysical doubt as to the material facts," will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000) (internal citations omitted).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id*. at 325; *Doe v. R.R. Donnelley & Sons, Co.,* 42 F.3d 439, 443 (7th Cir. 1994). Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). But, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *Celotex,* 477 U.S. at 322*; Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir. 2003).

**Discussion**

Dr. Remley's claim focuses on three main contentions: (1) that Midwest's attempt to collect operating expenses from him is unsupported by the parties' Agreement; (2) that Midwest failed to provide him with the equipment and nursing assistance necessary for him to practice his area of medicine; and (3) that Midwest did not timely produce the financial records required by the Agreement.

"Where there are no genuine issues of material fact, contract interpretation is particularly well-suited for summary judgment." *Allstate Ins. Co. v. Tozer*, 392 F.3d 950, 952 (7th Cir. 2004); *see also Eckart v. Davis*, 631 N.E.2d 494, 497 (Ind. Ct. App. 1994) (holding that the interpretation or legal effect of a contract is a question of law to be determined by the court). "A plaintiff moving for partial summary judgment on the issue of liability in a breach of contract claim initially must 'show' only that there is no genuine issue of fact regarding the liability elements of its claim." *Pantry, Inc. v. Stop-N-Go Foods, Inc.*, 796 F. Supp. 1164, 1167 (S.D. Ind. 1992).

The primary purpose of contract construction is to determine the "mutual intention of the parties." *Hutchinson, Shockey, Erley & Co. v. Evansville–Vanderburgh Cty. Bldg. Auth.*, 644 N.E.2d 1228, 1231 (Ind. 1994). Such intent is discerned as of the time the contract was made and by considering the language used by the parties to express their rights and duties. *INB Banking Co. v. Opportunity Options, Inc.*, 598 N.E.2d 580, 582 (Ind. Ct. App. 1992). The first step in discovering intent is to gather meaning from the "four corners" of the written document. *Kutche Chevrolet-Oldsmobile-Pontiac-Buick, Inc. v. Anderson Bank. Co.*, 597 N.E.2d 1307, 1309 (Ind. Ct. App. 1992). Courts must give

words their plain and usual meaning, unless review of the contract as a whole reveals some other meaning was intended. *INB Banking Co.*, 598 N.E.2d at 582. We may not construe unambiguous language to give it anything other than its clear, obvious meaning, and we may not add provisions to a contract that were not placed there by the parties. *Simon Prop. Group, L.P. v. Michigan Sporting Goods Distrib., Inc.*, 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005) (citing *Art Country Squire, L.L.C. v. Inland Mortg. Corp.*, 745 N.E.2d 885, 889 (Ind. Ct. App. 2001)). Dr. Remley contends that there is no ambiguity in the Employment Agreement. [Dkt. No. 39 at 9-10.]

A. **Overhead Costs/Operating Expenses**

It is Dr. Remley's position that he is under no obligation to pay any portion of Midwest's "Operating Expenses" on the grounds that no provision of the Employment Agreement authorizes Midwest to charge him for those costs. In response, Midwest accuses Dr. Remley of ignoring Exhibit A to the Employment Agreement ("Exhibit A"), which sets forth the process for allocating general overhead expenses to him.

The term "Operating Expenses" is defined in the Agreement as "all costs and expenses of [Midwest] . . . that are not classified by [Midwest] as Direct Provider Physician Expenses or as NP and PA Expenses." [Agreement § 4.1(i).] Section 4.5 of the Agreement authorizes Midwest to classify, "in its sole and reasonable discretion," expenses, for example, "for tax or accounting purposes or for purposes of this Agreement", which expenses are Direct Provider Physician Expenses and which are treated as Operating Expenses. These are the only two uses of the term "Operating Expenses" in the Agreement. Accordingly, Dr. Remley is correct that the Employment Agreement does not expressly

11

impose on him a duty to pay "Operating Expenses" as that term is defined in the Agreement. [*See* Agreement § 4.1(a) (Operating Expenses not among "Accumulated Net Collections Deficit"; § 4.1(e) (not included in "Net Employee Collections); § 4.3 (not included in "Additional Payments").] Midwest does not explicitly disagree, but cites Exhibit A as its basis for collecting operating expenses from Dr. Remley.

As quoted above, § 5 of Exhibit A provides: "General Allocation Expenses will be attributed to Employee through a graduated process as follows:", which increases from 15% to 33.33% over a period of four months, "plus direct Employee expenses attributable them." "Direct Employee expenses" is not a term defined in the Agreement or Exhibit A. It is Dr. Remley's position that Exhibit A's use of the term "General Allocation Expenses" refers to "Direct Provider Physician Expenses" in § 4.1(c) of the Agreement. He argues that Midwest would aggregate the doctors' Direct Provider Physician Expenses and then divide the total cost among the doctors. Dr. Remley's percentage share of those costs were to increase over the first four months of his employ, leveling off at 33.33%. We are not persuaded by this approach.

The plain language of Exhibit A states that General Allocation Expenses are taxed *in addition to* "direct Employee expenses attributable [to Dr. Remley]." [Ex. A.] Exhibit A references two costs to be assessed to Dr. Remley: general expenses and direct expenses. Dr. Remley's argument that "General Allocation Expenses" refers to the method of allocating Direct Provider Physician Expenses ignores that General Allocation Expenses are *in addition to* (i.e., not identical to) direct Employee Expenses. Nowhere in the parties'

12

Agreement is language aggregating direct expenses which are then allocated among the Provider Physicians.

The logical interpretation and harmonization of the Agreement's use of the terms Direct Provider Physician Expenses, Per Physician Allocation,[4] Operating Expenses, direct Employee expenses, and General Allocation Expenses is that there are some expenses directly attributed to a specific physician, i.e., Direct Provider Physician Expenses, NP and PA Expenses, and direct Employee expenses, which are specifically accounted for in the calculation of Net Employee Collections, and there are other general overhead expenses, which are distributed among the physicians pursuant to Exhibit A and the Per Physician Allocation. To hold otherwise would contravene Indiana law and make Exhibit A meaningless. *See Hammerstone v. Ind. Ins. Co.*, 986 N.E.2d 841, 846 (Ind. Ct. App. 2013) ("A court should construe the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless.") (citation omitted). Because the General Allocation Expenses referenced in Exhibit A and "attributed to" Dr. Remley must have some meaning separate and apart from the other direct expenses charged to him, we reject Dr. Remley's contention that he is not responsible for overhead or operating expenses. Dr. Remley is responsible for General Allocation Expenses referenced in Exhibit A in addition to Direct

---

[4] Neither party addresses the term "Per Physician Allocation" [Agreement § 4.1(f)], defined by the Agreement as "a fraction equal to one (1), divided by the number of" Provider Physicians. The definition affords Midwest the discretion to alter the percentages for part-time Provider Physicians. The term Per Physician Allocation is not used in the Agreement. We interpret § 5 of Exhibit A to set forth the specific allocation percentage assigned to Dr. Remley at start of his employment which then transitioned to the "normal general allocation expenses of [Midwest]", described in § 4.1(f) as "Per Physician Allocation."

13

Provider Physician Expenses. For these reasons, we DENY Dr. Remley's Motion for Summary Judgment on this issue.

**B.     B.     Midwest's Alleged Failure to Provide an NP or RN, Proper Equipment and Supplies, and Financial Reports**

Dr. Remley also seeks summary judgment on his claim that Midwest breached the Employment Agreement when it failed to employ a nurse practitioner or registered nurse and provide adequate equipment and supplies as required by § 3.2 of the Agreement and that Midwest did not provide him with financial reports as agreed in § 4.4. Dr. Remley does not argue that any of these breaches was material and does not seek, by way of his motion for summary judgment, any damages related to these alleged breaches.

**1.     Nursing Assistance**

The Employment Agreement unequivocally states that Midwest will provide "attendants, facilities and services suitable to [Dr. Remley's] specialty/ies and adequate for [Dr. Remley's] provision of services pursuant to [the Employment] Agreement." [Agreement § 3.2(a).] Dr. Remley's undisputed testimony establishes that he informed Dr. Levine of the type of care and interventional pain management procedures that he performed and the type of guided injection procedures that he used to treat acute and chronic pain. [Remley Aff. ¶¶ 10-11.] Dr. Remley contends that he "made it clear to Levine that a nurse must be in place at MPI capable of assisting [him] with in-office sedation for interventional procedures." [*Id.* ¶ 14.] It is undisputed that, at the time of Dr. Remley's preliminary discussions with Midwest prior to executing the Employment Agreement, Midwest had a nurse practitioner on staff; however, there was no nurse on staff

at Midwest at the time Dr. Remley began (or ended) his employment there. [*Id.* ¶¶ 12, 14, 20.]

Midwest urges us to interpret § 3.2's requirement that it provide "attendants" to be limited to administrative support and stenographic help. Indeed, says Midwest, when the parties meant "nurse" in other parts of the Agreement, they used the term "nurse," and, thus, § 3.2 must mean something other than a "nurse." We disagree.

Although § 3.2(a) does apply in part to "stenographic help," the attendants required is further described in terms of those services "suitable to [Dr. Remley's] specialty/ies and adequate for [Dr. Remley's] provision of services." Because "attendants" is described in terms of Dr. Remley's specialties, that term means something more than general administrative assistance. Moreover, the Employment Agreement anticipates Midwest's hiring of nurse practitioners and physician assistants. [Agreement §§ 4.1(g) and (h).] Dr. Remley had made it clear that a nurse was required in order for him to perform all of his services in Midwest's offices and the Agreement explicitly obligated Midwest to provide one.

Questions of fact exist, however, with respect to whether Midwest is liable for failing to provide nursing assistance to Dr. Remley. The Employment Agreement states that at the time it was executed, Midwest allocated NP and PA expenses and Revenues "equally between or among the physicians who opt to utilize the services of an applicable [NP or PA]." [Agreement § 4.5.] At the time Dr. Remley began with Midwest, Midwest did not have an RN or NP on staff. [Border Decl. ¶ 11.] When Dr. Remley and his wife "explored with [Ms. Border] the possibility of Midwest hiring [an RN or NP] to assist Dr.

15

Remley," Ms. Border explained, consistent with the terms of the Agreement, that Dr. Remley would bear the full expense of the nurse because the other two practicing doctors did not need nursing assistance. [*Id.*] Dr. Remley decided not to require Midwest to hire a nurse to assist him. [*Id.*] Construing all facts in a light most favorable to Midwest and drawing all reasonable inferences in favor of Midwest, because Dr. Remley declined Midwest's offer to hire a nurse at his expense, Dr. Remley has not proven that Midwest breached the contract. We therefore DENY Dr. Remley's Motion on this point.

## 2. Equipment

The parties do not dispute that Midwest had an obligation to provide the necessary supplies and equipment to Dr. Remley. However, a genuine issue of material fact exists as to whether the equipment necessary to Dr. Remley's practice was provided. Dr. Remley stated in his affidavit: "Necessary medical supplies for my practice were either unavailable in these offices or were expired and could not be used." [Remley Aff. ¶ 24.] He also averred that the fluoroscopic equipment in two of Midwest's three offices was "sub optimal" and he could not obtain adequate images to safely perform certain procedures. [*Id.* ¶ 26.]

Midwest rejoins that Dr. Remley never complained to it that the fluoroscopic equipment and materials it had purchased were inadequate. [Levine Decl. ¶ 9; Border Decl. ¶ 13.] In fact, upon his departure from Midwest, Dr. Remley took with him nearly $10,000 worth of supplies specifically related to his practice (and for which Midwest charged Dr. Remley directly). [Border Decl. ¶ 12.] Moreover, the fluoroscopic equipment was promptly repaired whenever necessary. [*Id.* ¶ 13.] Construing all facts in a light most

16

favorable to Midwest, we conclude that a genuine issue of material fact exists precluding summary judgment on this issue and DENY Dr. Remley's Motion on this point.

### 3. Midwest's Failure to Provide Financial Reports

It is undisputed that Midwest failed to provide Dr. Remley with financial reports as required under the Employment Agreement. Section 4.4 of the Agreement requires Midwest to provide Dr. Remley with its "calculation of Employee Net Collections" ("Net Employee Collections" is defined in § 4.1(e)) for the prior month and Dr. Remley's "Accumulated Net Collections Deficit (defined by § 4.1(a)) as of the last day of the prior month. It is undisputed that Midwest did not provide Dr. Remley with these calculations during the timeframes set forth in the Agreement.

Midwest contends that it had good reason for failing to provide Dr. Remley this data and in any event Dr. Remley did not demand strict performance. According to Midwest, shortly after Dr. Remley was hired its financial statements were in poor shape preventing it from being able to provide Dr. Remley with reliable statements. Midwest hired a new administrator to organize its financial records and, in December 2014, it provided Dr. Remley with financial statements covering July through November 2014. [Border Decl.¶¶ 5-6.] Dr. Remley did not object to the delay at the time.

Midwest's explanation for its failure to perform as agreed is irrelevant as a response to a breach of contract claim. *See Patton v. Mid-Continent Sys., Inc.*, 841 F.2d 742, 750 (7th Cir. 1988) ("That is, if the promisor fails to perform as agreed, he has broken his contract even though the failure may have been beyond his power to prevent and therefore

17

in no way blameworthy."). Likewise, Dr. Remley's failure to object to the failure is irrelevant. The parties expressly agreed that "[a]ny failure by either party to enforce any right arising under this Agreement shall not be deemed a waiver of the ability to later enforce that right." [Agreement § 17.9.] The facts demonstrate that Midwest failed to report financial data to Dr. Remley as required by the Agreement and Dr. Remley contends that "[t]imely reporting . . . may have headed off the problems presented by this lawsuit." [Dkt. No. 39 at 10, n.1.]

Thus, we GRANT summary judgment in favor of Dr. Remley on the issue of Midwest's technical breach of the Employment Agreement by its failure to provide financial reports to Dr. Remley. Whether this delay resulted in Dr. Remley's suffering any measurable damages we leave for another day.

## Conclusion

For the reasons explicated above, we GRANT IN PART AND DENY IN PART Dr. Remley's Motion for Summary Judgment [Dkt. No. 38]. The case shall proceed accordingly towards a final resolution of these issues.

Date: 6/19/2017

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

| | |
|---|---|
| Andrew M. McNeil<br>BOSE MCKINNEY & EVANS, LLP<br>amcneil@boselaw.com | Brian M. House<br>SKILES DETRUDE<br>bhouse@skilesdetrude.com |
| Mark Wohlford<br>BOSE MCKINNEY & EVANS, LLP<br>mwohlford@boselaw.com | Raymond D. Faust<br>STARR AUSTEN & MILLER LLP<br>faust@starrausten.com |